Good morning, your honors. My name is Alyssa Ponte and I have the privilege of serving as appointed counsel for the appellant, Mr. Junaidu Savage, for the purposes of this appeal. Now, we bring before this court several errors on appeal. But ultimately, this is a one witness case where several of the district court's errors impaired Mr. Savage's ability to impeach the witness's testimony and hindered the jury's ability to properly assess her credibility. Further, the district court erred in applying several sentencing enhancements that were not supported by this court's precedent, the record, or were not adequately articulated to enable this court to conduct a meaningful review. Unless your honors have a preference, I will begin by discussing the government's required disclosures under Brady and Jenks, and then I will proceed to amount of loss and other sentencing concerns. Under Brady and Jenks, it is simply not the case, as the government argues, that the prosecutor's notes were not reviewable in camera, nor are we arguing that the prosecutor's notes are always subject to review. Instead, in this case, the district court hamstrung Mr. Savage's defense by failing to review the notes in camera when they were the only memorialization of the government's four meetings with its critical witness that occurred over the course of months and years in what is essentially a one witness case, and where the government admitted that there were inconsistencies all the way through her story. Mr. Savage met and exceeded this court's standards in U.S. v. King and U.S. v. Boyd by making a plausible showing of Brady material and laying a sufficient foundation for Jenks' statements to require in-camera review. He identified one critical document in the government's possession to which he did not have access, and the government admitted again that there were inconsistencies all the way through the witness's testimony, but it did not provide a formal report. Thus, the district court committed a prejudicial error, and we request that this court vacate and remand for a rehearing. Where is there evidence that any portion of these notes were approved by the witness? How do we know these were statements by the witness on this record? We argue that because the government never represented that the notes did not contain substantially verbatim statements under 3500E2, that the district court erred in failing to review for those substantially verbatim statements. Further, mere representation by the government is insufficient to discharge the district court's requirement to review, given that Mr. Savage laid a sufficient foundation. How did he lay a foundation? He identified one single document which the government admitted was connected to the testimony of the witness. Did you say notes? The government didn't say it was the witness's statement, did the government? I thought the attorney was making notes. You have to do a little bit better than that to show the attorney's work product. Just showing the attorney's work product doesn't get you where you need to go under Janx Act material, does it? Under U.S. v. Boyd, this court held that the defendant had laid a sufficient foundation for potential Janx material for one document, where he identified that single document and related it to the testimony of the witness. We don't know what was in the notes in question because Mr. Savage had no ability to review. Further, in U.S. v. Smith, this court did review the prosecutor's notes for, among other things, whether they contained substantially verbatim statements. We're not saying that they necessarily did. They might. They might. And my question is, is that enough to make the verdict? We're unclear about how else Mr. Savage could have possibly made a further showing, and because the government never made the representation that they did not contain substantially verbatim statements, in either at trial or in its briefs. We argue that that strongly militates in Mr. Savage's favor in requiring the courts to review a camera. And we don't, again, we don't argue that the court must. Yeah, I'm sorry. Let me cut you off. Because what I'm worried about is it sounds to me like the case is really nothing more than, or your argument on this point is nothing more than speculation that they might contain verbatim statements. And that clearly can't be enough. Otherwise, that would be the case in every instance. If the government took notes, there might be some evidence. There might be witness statements. So there has to be more than that that's required. So tell me what you've done. What's the plus information that you have that gets you over the hurdle of mere speculation? In response to your question, we would identify the fact that the provided disclosures consisted of only summarized statements of what Ms. Conte said in Tarleah over meetings that occurred years and months in the past. But they contained minute details from these meetings that the government chose to disclose to the defense when it determined that it had been inconsistent with a statement she made at a previous meeting. So the notes obviously contain substantially more information on these meetings, including details such as how long the alleged first meeting lasted, whether it was 30 minutes or 35 minutes. So these notes very plausibly contain substantially verbatim statements, given that they contain so much information that was only disclosed in bits and pieces to the defense. And because no formal report was provided to the defense as is federal practice, this Court's holding in U.S. v. Hinton is also not applicable, which held that if the notes are translated into a formal report, they are not required to be maintained under Jenks. Counsel, I'm not seeing you arguing this, but you're saying that, following up with Ms. Hinton's question, that you think because of inconsistency sort of swirling around in this witness, and that's one thing that's going to clear this record. The other is that it's clear that some notes or some recordings or whatever exist. Are you saying that there would be a sense that an in-camera review would be required? If no formal report has been provided, if a formal report is provided, then this Court's precedent in U.S. v. Hinton would control, and the notes wouldn't be subject to review. However, in this case, no such report was provided, and the defendant identified only one document he knew existed, and where the government admitted there was more material, but did not make even any representation that they didn't contain substantially verbatim statements. It's almost like a Shakespeare type thing. I think thou protest too much. If there's nothing there, what's wrong with the Court looking at it in camera, which means in the box? Exactly. Unless there are other questions, I will now proceed to discussing the sentencing enhancements. First, at sentencing, the District Court erred in applying a 10-level enhancement for amount of loss, because it incorrectly interpreted intended loss to include bank accounts to which the conspirators never possessed the tools to access the funds, and thus affect the loss that is the checkbooks. Amount of loss under the guidelines is a fairly mechanical measure used to assess the amount of pecuniary loss caused by the fraud. If the District Courts wanted to increase the sentence based on the non-pecuniary harm to victims merely targeted by the fraud, they could, of course, do so, but not using the guidelines for amount of loss. And amount of loss clearly includes amounts that are impossible or unlikely to occur. But this is meant to open the door for narrow exceptions, such as for a government sting operation, or where the defendant just didn't have enough time to drain all the money from the account. But this Court has never so far expanded the definition to include amounts that were impossible because the defendants did not even have the ability to affect the loss. Thus, we request that this Court remand for resentencing on this point. The District Court also committed further errors relating to sentencing by applying several enhancements that were in contradiction to the facts on the record. Going back to the first year of criminal law, the whole idea, is there an inability to effectuate the total amount, no matter the question of fact or law, that limits them from getting there? Is that just a matter of fact they couldn't access all of it? It would be a fact if the Court had determined whether or not they had access. However, the argument is that the interpretation of the definition of intended loss under the guidelines to include amounts to which they didn't have access. But the intent is they would like to have gotten their hands on all of it, correct? Arguably so. I would think so. But why is there that satisfying intent? And why is it just a mere matter of fact they couldn't prevent the implementation of the enhancements? Intended, as per the definition by this Court's precedent, and in terms of the intent of the guideline, is not coterminous with the attempted loss for the entire scheme. It's a much narrower definition, and if the Court wanted to apply a greater sentence because the defendants had merely been targeted, the number of targeted victims, then it could of course do so, but it doesn't fit within the definition of intended loss as evinced by this Court's precedent. Such as in the government-cited case to U.S. v. Miller, intended loss included amounts that the defendant had billed to Medicaid but had not yet received. But it didn't include amounts that the defendant had not yet even written any of the invoices for, or had considered submitting. If there are no further questions, I will rest at the moment. I will rest. Thank you. Thank you. Mr. McKenzie? Good morning, Your Honors, and may it please the Court, Ray McKenzie, on behalf of the United States. As the Court is aware, appellants raise a whole host of issues in this case. The government's position is that none of them are meritorious, and of course this Court should affirm. Although there are a number of issues that were raised, I think I'll address initially the Brinks and the Jadys, the Brinks, the Jinks, and the Brady issue. I think the Court, Judge Keenan very keenly pointed out that in this case, the defendant did not get beyond mere speculation, which would have enabled him to an in-camera review. And on that note, I think that with regard to an in-camera review, defense counsel, and I should note this, I was one of the trial counsel that informs the panel's questioning, but at the district court level, when defendant requested access to attorney notes, they never requested an in-camera review. So I think to the extent that the Court considers that at all, that either it's waived or it's to be viewed under plain error at the most. But I will say as a factual matter, Your Honor, it's hard to say, look in hindsight, but I believe we would have objected because our position is that what was provided to defense counsel at the trial level was a complete set of all the inconsistencies that we were able to identify throughout the various statements we received from Ms. Conte. And if you look in the supplemental joint appendix, you will see that we set out in the supplemental joint appendix all of the various inconsistencies between the meetings. And we set it out as plainly as we could, and we identified even matters that in our view were trivial, which did not get to the question of guilt or innocence, which did not really impeach the witness besides some trivial amount. And if you look at what we identified, it's clear that we were doing our best to provide everything that we could in terms of the inconsistencies between Ms. Conte's statement. The biggest inconsistency in her statement, of course, was what we found out three days before trial, and that is she had actually gotten some benefit out of the scheme. That's the biggest inconsistency that we were presented with by Ms. Conte, which we immediately turned over to the other side. I think that in terms of requesting to see our notes, Judge Russell, himself a very experienced district judge and former prosecutor, he understood that our office, as we always try, were being consistent with our obligations under Brady, our obligations. And I'll set aside Jinx because I don't think Jinx applies here at all. It doesn't apply because, as Judge Keenan pointed out, there was no evidence on the record that this was either a verbatim statement or that our notes were adopted by the witness. Now, one of the questions was, how would that record have been developed? Well, the case law says that you develop that record on cross-examination, and you ask those questions to make a determination as to whether the notes that the lawyers took in this case would fit under the definition of Jinx. Your Honor, that was not done. Defense counsel asked for access not just to our notes from meetings with Ms. Conte, in terms of this notion that they requested one document. That's simply inconsistent with the record. What they requested were any reports, notes, and other recordings related to our discussions with any co-conspirator, including those co-conspirators who had already pled guilty and had already been sentenced. In light of that, first of all, there were no such reports. What we had were counsel's notes that were taken in preparation for trial. Each time we met with Ms. Conte, it was just before trial. She was, of course, locked up in Connecticut, and we had to wait on the marshal service to get her to us, and that didn't occur until right before trial. We did have one meeting via videoconference. But in terms of a particular request, that's just not the case. It was a broad-based fishing expedition. What was provided to defense counsel, defense counsel made much of the language used in our letters, in that these were statements from Ms. Conte inter alia. That just simply means she said other stuff, but what we're providing you are the consistent statements that she provided. And Brady, of course, requires the government to turn over information that is potentially impeaching or that is exculpatory, and that's what was provided in our letters to defense counsel. And they have not made a showing that, one, they asked for an in-camera review, or, two, that any information in our notes was different from the information that was provided. With regard to the sentencing issues, I was somewhat perplexed by the argument on the loss amount. I think the rule is pretty clear that in terms of when you calculate the loss, it's either the actual loss or intended loss, whichever one is greater. And in this case, the intended loss was greater than the actual loss. The actual loss is important in that it demonstrates our basis for the intended loss. There were seven victims that Ms. Conte accessed their information and then passed that information over to Mr. Savage. Mr. Savage, who was identified on calls during trial by two witnesses, called into the bank and then took over their accounts, ordered checks, and then they wrote checks in order to drain the accounts. Now, the actual loss in this case was just over $36,000, and that is because one of the victims, they were able to successfully take over the account and then write checks, cash them, and drain the account. They drained it to the amount of $36,000. Ms. Sylvia Lloyd, who testified at trial, she was the counter-fraud person at the bank, and she talked about the countermeasures that the bank employed in order to stop the scheme. The conspirators, including the defendant, attempted to drain each of these accounts, and that's the amount that was put forth. Judge Russell sat over two trials. He sat over the Conte trial. He also presided over the Savage trial. And what the government did in an effort to be reasonable, although in our subsequent investigation after Ms. Conte's trial, we identified additional accounts that she had accessed and passed that information over to the co-conspirators. There were actually two additional accounts, which would have added $100,000. In our attempt to be reasonable, we asked Judge Russell to limit the loss amount solely to the amount that he had found with regard to Ms. Conte. And I don't think the question on intended loss is even a close one if we look at the plain language of the rule and the application notes. I don't know if the Court is interested in any of the other – I think there are seven other issues that were raised. I'm interested in the sophisticated means enhancement. Yes, ma'am. It seems to me that this case is a lot different from our decision in White. That, to me, was a classic case of sophisticated means. Tax identification numbers created, accounts created impersonating another individual, setting up post office boxes in addition to – for filing purposes to defraud the governmental authorities or to deceive the governmental authorities. And this really seems to pale in comparison as far as the level of sophistication. This seems to be garden-variety fraud to me. I mean, I know your burden is lower in terms of the preponderance standard, but tell me your best case for why this was sophisticated. Thank you, Your Honor. Our best case is that there were – first of all, there were different layers to the conspiracy. The guidelines speak of having different hierarchical components to the conspiracy. In this case, we had different levels. We had Mr. Savage and another individual who was identified at trial as Ms. Sadiq. Those two were the apparent ringleaders. They were the ones who then recruited Ms. Conte, who worked at the bank. Ms. Conte was the insider who was able to get the information, and then that information was passed first to Ms. Sadiq and then subsequently to Mr. Savage and the account was taken over. So that's two levels of the conspiracy. But there was another level. I didn't mean to cut you off, but how were the means of committing the crime? It seems to me that when the courts discuss these crimes, they're looking at the means of committing the crime. How were the means of committing the crime sophisticated in this case? Well, sophisticated in the sense that, as I mentioned, the hierarchy, but they were able to take insider information and take over the accounts and impersonate the account holders. I think if you look at a generic bank fraud, in that case you might present a bad check or you might present simply a false identification in order to cash a check. I think this is far beyond what a generic fraud might look like. In this case, it took extraordinary efforts by Capital One in order to identify the fraud. You have this individual calling into multiple accounts, taking over the accounts, and then ordering checks and then cashing those checks or having co-conspirators cash that check. I think there is a level of sophistication when you are directing others and you're concealing your identity, as Mr. Savage did in this case. Nothing on the record identified Mr. Savage as Mr. Savage. He took extraordinary steps to conceal who he was. He had, I think there was a Mr. Jabby testified that Mr. Savage, on average, would have four or five phones on him and he would be using those phones, and he overheard Mr. Savage talking about bringing the checks and getting the checks. The phone that we tagged that we were able to identify as the fraudulent, the center of the scheme was a phone number that was a white iPhone ending in 7412. That was the phone that he used to communicate directly with Ms. Conte. That phone was in somebody else's name. There were no phones that were put in his name. He took extraordinary steps to conceal who he was and to try to thwart the counter-fraud measures at the bank. And as Judge Russell found, those facts constitute sophisticated means under the language provided in the guidelines. I think the Fourth Circuit case in Duell was the 2012 per curiam opinion. The court there talked about hiding assets in even legitimate bank accounts. And in a sense, it's not on all fours, but in a sense, that's what Mr. Savage did. He took over the account and, you know, these were legitimate accounts. These were real accounts, but he used it in the course of his scheme. I think Jackson, which was a Fourth Circuit opinion in 2003 by Judge Newman, wrote that opinion. And he talked about the fact that not every piece of the scheme has to be sophisticated, but if you put all the pieces together, and I think the language is that all the steps were linked together so that the defendant could perceive and exploit different vulnerabilities and different systems in a coordinated way. And that's exactly what we have in this case. Sylvia Lloyd, who was the counter-fraud individual from Capital One who testified at trial, she talked about all the countermeasures that the bank had in place. And in spite of all of that, these conspirators were able to at least successfully clear out one person's account before the bank was able to put in some other measures that required individuals to come in or required individuals' passwords. I think Jackson would be very instructive in terms of sophisticated means. It matches what occurred here. Does the Court have additional questions? Well, with that, Your Honors, I ask that you would affirm the judgment and the sentence below and that with that I'll submit on the record. Thank you. Ms. Potts, you have some time reserved. Thank you. The appellant would argue that the District Court's databases for the sophisticated means enhancement were either not based on the record or are inherent to a scheme or artifice to commit bank fraud. Indeed, the government has identified no actual sophisticated means which the conspirators allegedly use. And this Court has reversed a sophisticated means enhancement in a case that is similar but more complex than the case before today. In U.S. v. Adepoju, this Court reversed where the defendant stole victim's personal identification information, created a fictitious company, including the employer identification number, where the conspirator opened two bank accounts in each victim's name and then deposited money using counterfeit checks provided allegedly by an insider official, although it was a government sting operation, where the defendant allegedly used five phones and had extensive forgery tools, including Social Security cards and blank checks. Mr. Savage's case is clearly less sophisticated than this, and the government has not identified any point at which it was using more sophisticated means. Using insider information and impersonating the victims is the definition of bank fraud under 1344. Did they have to fabricate checks? I'm sorry? Did they have to fabricate any checks? No, they ordered them directly through the bank. For the same name and person? Exactly. And just signed them off? Yes, which they knew what the signature looked like based on pictures that Ms. Conte took of the screen in the bank. Again, none of this alleges sophisticated means in any way. Accessing multiple accounts and concealing one's identity is inherent to bank fraud. And the cited cases in Dwell, their sophisticated means there was the defendant used a complex accounting scheme to essentially turn one of the accounts into a hidden account that he used to hide the funds he was embezzling, deep within the books and records. Significantly required significant knowledge of sophisticated accounting techniques to do so. And in Jackson, the defendant there accessed multiple different entities as part of the fraud, including he would call the banks, the hotels, the credit companies, all to get information. And then he would order various goods to hotels in different states. So you get that sophisticated means from the multi-jurisdictionality of that case. So neither of those cases are relevant here. Relating to the Brady and Jenks arguments, if there are no further questions on sophisticated means, all that the defendant needs to do here where the government has not provided a report is prove that the notes might contain some substantially verbatim statement. If the government wants to avoid disclosing these notes, it can provide a formal report and thus the notes wouldn't be subject to review under Hinton. Further, the courts have a duty to determine whether materials contain potential Jenks or Brady information. And the courts have latitude in exercising this authority, but under this court's precedent, once the defendant makes a substantial, or lays a sufficient foundation, or makes a plausible showing, then it is required to conduct this in-camera review. Further... Does it make any difference if the counsel corrects it if the request for an in-camera review is not made? Not in this case, no. Does that make a difference? No, because it is the court's responsibility to administer the Brady and Jenks Act under this court's precedent. To administer it? Yes. What do you mean by that? They have the duty to decide whether or not the materials contain potential Brady or Jenks information. Because it, as I'm using your word, because it might have something in it? Because it is sufficiently, the foundation is sufficiently laid by identifying, in this case, there was no substantially, there was no representation that a substantially verbatim statement were not contained in the notes. Thank you, Your Honors. Ms. Potter, also note that you are a court opponent. Also, thank you for your service, and I appreciate the work you do on behalf of the court. Thank you. Ms. McKenzie, also, you're able to represent the United States. Thank you. We'll come back with counsel to proceed to our final case of the term.
judges: Roger L. Gregory, Barbara Milano Keenan, Henry F. Floyd